# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TOPPERS SALON & HEALTH SPA, INC., | : | |
| | : | |
| *Plaintiff,* | : | Civil Action No. 2:20-cv-03342 |
| v. | : | |
| | : | |
| TRAVELERS PROPERTY CASUALTY | : | |
| COMPANY OF AMERICA, | : | |
| | : | |
| *Defendant.* | : | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

SPECTOR GADON ROSEN VINCI P.C.

Daniel Dugan, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA, 19103
215.241.8872/ 215.531.9120 (fax)
ddugan@sgrvlaw.com

July 24, 2020

*Attorneys for Plaintiff,*
*Toppers Salon & Health Spa, Inc.*

### *TABLE OF CONTENTS*

FACTUAL BACKGROUND ................................................................................................1

SUMMARY ....................................................................................................................1

ANALYSIS .....................................................................................................................2

    I.      Background: If the Insured's Interpretation of the Policy Language is
          Reasonable, the Insured's Interpretation Must Be Adopted .....................................2

    II.     Coverage Exists Under the Insuring Agreement in the "Business Income"
          Portion of the Policy If the Operations Were Suspended Either
          (a) Because of a Direct Physical Loss, or (b) Because of
          Direct Physical Damage ...........................................................................................4

          A.      Coverage Exists Under the Insuring Agreement in the "Business
                 Income" Portion of the Policy Because There Has Been a Direct Physical
                 Loss ...............................................................................................................4

          B.      Coverage Under the Insuring Agreement in the "Business Income"
                 Portion of the Policy Because There Has Been Direct Physical
                 Damage ........................................................................................................10

    III.    Coverage Exists Under the Insuring Agreement in the "Civil Authority"
          Portion of the Policy ...............................................................................................14

    IV.    Toppers Does Not Have to Prove That the Virus Was Present in its
          Building on the Day That Toppers Suspended Operations ....................................15

    V.     The Virus Exclusion Does Not Eliminate Coverage for the Insured's
          "Continuing Operating Expenses" ........................................................................20

    VI.    If Toppers Were Not Entitled to Coverage for "Continuing Operating
          Expenses," The Coverage Afforded by the Policy Would Be Illusory .................26

CONCLUSION ..............................................................................................................29

i

# TABLE OF AUTHORITIES

**Cases**

*Accord Aronson Associates, Inc v. Pennsylvania Nat. Mut. Cas Ins. Co.*,
14 Pa. D&C.3d 1, 1977 WL 181 (C.P. 1977), aff'd, 272 Pa. Super. 606,
422 A.2d 689 (1979) .......................................................................................... 20

*Accord, e.g., Travco Ins. Co. v. Ward,*
715 F. Supp.2d 699, 703, 707–708 (ED Va 2010) ................................................ 12

*Aetna Cas. & Sur. Co. v. Valley Nat. Bank of Ariz.*,
15 Ariz. App. 13, 485 P.2d 837, 840 (Div. 1 1971)............................................... 21

*American Ins. Co v. Naylor,*
103 Colo. 461, 87 P.2d 260 (1939) ..................................................................... 25

*Cas Ins. Co v. Avent Am., Inc.*
612 F.3d 607, 616 (7th Cir. 2010) ...................................................................... 24

*Cincinnati Ins. Co v. H.D. Smith, LLC,*
829 F.3d 771, 774 (7th Cir. 2016) ...................................................................... 24

*Columbiaknit, Inc. v. Affiliated FM Ins. Co.*,
1999 WL 619100, at *6 (D. Or. Aug. 4, 1999) ..................................................... 11

*Continental Ins. Co. v. McKain,*
820 F. Supp. 890, 897 (E.D. Pa. 1993), *judgment aff'd*, 19 F.3d 642 (3d Cir. 1994) ........... 6

*Essex v. BloomSouth Flooring Corp.*,
562 F.3d 399, 406 (1st Cir. 2009)....................................................................... 13

*Farmers Ins. Co. of Oregon v. Trutanich,*
123 Or. App. 6, 858 P.2d 1332 (1993) ................................................................. 11

*Farmers Ins. Co. of Oregon v. Trutanich,*
123 Or.App. 6, 858 P.2d 1332, 1336 (1993) ........................................................ 13

*Farmers Texas County Mutual Insurance Company v. Zuniga,*
548 SW.3d 646, 652-53 (Tex. App. San Antonia 2017) ........................................ 24

*First National Bank of Manitowoc v. Cincinnati Ins. Co.*,
485 F.3d 971, 981 (7th Cir. 2007) ...................................................................... 28

ii

*Friends of Danny DeVito v. Tom Wolf,*
   227 A.3d 872, 891(Pa. 2020)................................................................ 9

*General Refractories Co v. First State Ins. Co.,*
   94 F. Supp.3d 649, 658, 660 (E.D. Pa. 2015)................................... 3

*Greenwood Cemetery, Inc v. The Travelers Indem. Co.,*
   238 Ga. 313, 316, 232 SE.2d 910, 913 (1977) .............................. 25

*Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.,*
   2014 WL 6675934, at *3 (D.N.J. Nov. 25, 2014) ........................... 11

*Gustafson v. Central Iowa Mut. Ins. Ass'n,*
277 N.W.2d 609, 612-13, 7 A.L.R.4th 484 (Iowa 1979)................. 21

*Hughes v. Potomac Insurance Co.,*
   199 Cal. App.2d 239, 18 Cal. Rptr. 650 (1962)............................. 13

*Hullverson Law Firm, P.C. v. Liberty Ins. Underwriters, Inc.,*
   25 F.Supp.3d 1185, 1191-95 (E.D. Mo. 2014) .............................. 28

*Largent v. State Farm Fire & Cas. Co.,*
   116 Or.App. 595, 842 P.2d 445(1992) ............................................ 11

*Leebov v. United States Fidelity & Guaranty Co,*
   401 Pa. 477, 165 A.2d 82, 84-85 (1960)........................................ 19

*Liberty Life Ins. Co. v. Commercial Union Ins. Co.,*
   857 F.2d 945, 951 (4th Cir. 1988) .................................................. 29

*Lower Paxton Tp v.  U.S. Fidelity and Guar Co.,*
   383 Pa. Super. 558, 557 A.2d 393, 402 (1989)............................. 10

*Lower Paxton Tp. v. U.S. Fidelity and Guar. Co.,*
   383 Pa. Super. 558, 557 A.2d 393, 402 (1989).............................. 6

*Lumbermens Mutual Casualty Co v. Yeroyan,*
   90 N.H. 145, 5 A.2d 726 (1949) ...................................................... 25

*Matzner v. Seaco Ins. Co.,*
   1998 WL 566658 (Mass. Super. 1998)........................................... 12

*Matzner v. Seaco Ins. Co.*,
    9 Mass L. Rptr. 41, 1998 WL566658 (Sup.Ct. August 12, 1998) ........................................ 7

*McAninch v.Wintermute*,
    491 F.3d 759, 769–70 (8th Cir. 2007) .................................................................... 28

*Medical Protective Co. v. Watkins*,
    198 F.3d 100, 104 (3d Cir. 1999) .......................................................................... 2

*Mitchell v. State Farm Fire & Cas. Co.*,
    954 F.3d 700, 706 (5th Cir. 2020) ........................................................................ 3

*Monticello Ins. Co. v. Mike's Speedway Lounge, Inc.*,
    949 F. Supp. 694, 699 (S.D. Ind. 1996) .............................................................. 28

*Motorist Mut. Ins Co. v. Hardinger*,
    131 Fed. Appx. 823, 826 (3d Cir. 2005) .............................................................. 7

*Motorists Mutual Ins. Co. v. Hardinger*,
    131 Fed.Appx. 823, 825–27 (3d Cir.2005) .......................................................... 13

*Murray Ohio Mfg. Co. v. Continental Ins. Co.*,
    705 F. Supp. 442, 444 (N.D. Ill. 1989) ............................................................... 29

*Murray v. State Farm and Cas. Co.*,
    203 W.Va. 477, 509 SE.2d 1, 17 (1998) .............................................................. 7

*Murray v. State Farm Fire & Cas. Co.*,
    203 W.Va. 477, 509 S.E.2d 1, 17 (1998) ............................................................. 13

*New Ponce Shopping Center, S.E. v. Integrand Assur. Co.*,
    86 F.3d 265, 268-69 (1st Cir. 1996) ................................................................... 22

*Oregon Shakespeare Festival Assn. v. Great American Ins. Co.*,
    2016 WL 3267247 (D. Or. March 16, 2017) ...................................................... 10

*Oregon Shakespeare Festival Assn. v. Travelers Ins. Co.*,
    2016 WL 3267247 (D. Or. March 16, 2017) ...................................................... 24

*Pepsico, Inc. v. Winterthur Intern. American Ins. Co.*,
    24 AD.3d 743, 896 NYS.2d 709, 711 (2d Dep't 2005) ....................................... 14

*Perry v. Allstate Indem Co.*,
    953 F.3d 417, 421 (6th Cir. 2020) ...................................................................... 3

*Pharmacists Mut. Ins. Co. v. Myer*,
    2010 VT 10, 993 A.2d 413, 418 (Vt. 2010) ........................................................... 28

*Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*,
    311 F.3d 226, 236 (3d Cir. 2002) ....................................................................... 7

*Radil v. National Union Fire Ins. Co. of Pittsburgh, Pa.*,
    207 P.3d 849, 857 (Colo. App. 2008), ................................................................ 28

*Schwartz v. State Farm Mut. Auto. Ins. Co.*,
    174 F.3d 875, 879 (7th Cir. 1999) ...................................................................... 29

*Sentinel Management Co v. New Hampshire Ins. Co.*,
    563 NW.2d 296, 300 (Minn. App. 1997) ............................................................. 7

*Sletten & Brettin Orthodontic, LLC v. Continental Cas. Co.*,
    782 F.3d 931, 938 (8th Cir. 2015) ...................................................................... 28

*SW Energy Corp v. Continental Ins. Co.*,
    1999 UT 23, 974 P.2d 1239, 1243 (1999) ........................................................... 8

*Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 406 N.J. Super.
    524, 543, 968 A.2d 724, 736 (App. Div. 2009) ................................................... 12

*Weisman v. Green Tree Ins. Co.*,
    447 Pa. Super. 549, 670 A.2d 160, 162 (1996) ..................................................... 2

*Western Fire Ins. Co. v. First Presbyterian Church*,
    165 Colo. 34, 437 P.2d 52 (1968) ...................................................................... 12

*Western Fire Ins. Co. v. First Presbyterian Church*,
    165 Colo. 34, 437 P.2d 52, 55 (1968) ................................................................ 13

*Wolf v. Home Ins. Co.*,
    100 N.J. Super. 27, 241 A.2d 28, 38-39 (Law Div. 1968) ...................................... 21

## **FACTUAL BACKGROUND**

Toppers Salon & Health Spa, Inc. (hereinafter "Toppers") is insured by Travelers Property Casualty Insurance Company of America (hereinafter "Travelers"), under an insurance policy attached hereto as Exhibit A. Between March 16 and 24, 2020, government closure and/or stay-at-home directives from Pennsylvania, New Jersey, and Delaware required Toppers to suspend its operations at all the insured premises. Copies of the directives are attached as Exhibits B, C & D. On June 10, 2020, Toppers requested the coverage owed under the terms of the policy when there is a necessary suspension of operations. Travelers denied coverage on June 30, 2020. Copies of those two letters are attached hereto as Exhibits E and F, respectively.

## **SUMMARY**

For an insured to be entitled to coverage, two things must be true. First, the insured's claim must be encompassed by one or more of the insuring agreements in the policy. Second, none of the exclusions in the policy can be applicable.

Based upon the undisputed facts set forth above, Toppers is entitled to coverage both under the "Business Income" insuring agreement in the policy,[1] and under the "Civil Authority" insuring agreement in the policy.[2] Moreover, no exclusion eliminates the coverage that Toppers is seeking - - the coverage afforded for "continuing normal operating expenses."[3] (Toppers is not seeking coverage for any other benefit, such as lost profits.)

After summary judgment is entered that coverage exists for Toppers's "continuing normal operating expenses," the parties should then be able to reach an agreement as to the amount of those

---

[1] *See* section III of this memorandum.
[2] *See* section IV of this memorandum.
[3] *See* section VI of this memorandum.

1

expenses. It is not anticipated that the parties will need the Court's assistance in making the calculation.

## ANALYSIS

**I.   Background: If the Insured's Interpretation of the Policy Language
is Reasonable, the Insured's Interpretation Must Be Adopted.**

When interpreting an insurance policy, in general, the only issue is whether the insured can show a reasonable interpretation of the words used in the policy that supports the insured's position -- because if an insured's policy interpretation is reasonable, at a minimum, the policy language is ambiguous, and the ambiguity would be resolved in favor of the insured. As discussed in Windt, Insurance Claims and Disputes (Thomson/West 2013 6th Edition) (2020 supplement) ("Windt"), section 6.2, pages 6-60 to 6-62, a policy provision is ambiguous if "it can be given two alternate reasonable interpretations," and if an ambiguity exists, "the interpretation that is most favorable to the insured will be adopted." In fact, as discussed in Windt, section 6.2, page 6-65:

> It is not enough for the insurer's interpretation to be adopted that its interpretation is more reasonable than the insured's interpretation. Otherwise, one would be resolving the ambiguity in favor of the insurer, in contravention of the foregoing rules.

Among the cases cited in Windt are *Medical Protective Co. v. Watkins*, 198 F.3d 100, 104 (3d Cir. 1999) (applying Pennsylvania law) (Insurer argued that an exclusion applied, and the court did not dispute that the insurer's interpretation was reasonable. The court nevertheless held in favor of the insured because ''the interpretation offered by the insured was also reasonable.'' The court also reiterated the principle that ''if a court should err in determining the meaning of an insurance policy provision, its error should be in favor of coverage for the insured''); *Weisman v. Green Tree Ins. Co.*, 447 Pa. Super. 549, 670 A.2d 160, 162 (1996) (Although the insured's suggested definition of the word ''explosion'' in the policy was not ''commonly used,'' court held in favor of the insured

because the word ''explosion'' was ''susceptible to more than one meaning''); *General Refractories Co v. First State Ins. Co.,* 94 F. Supp.3d 649, 658, 660 (E.D. Pa. 2015) ("Where more than one reasonable construction exists, the construction that favors coverage must be applied.". . . "As between Travelers and (the insured), which proffers the more reasonable interpretation... is not decided here." It is enough that the insured's interpretation "is objectively reasonable. Travelers cannot meet its burden of showing that (the insured's) interpretation is not reasonable"). *See also, e.g., Perry v. Allstate Indem Co.*, 953 F.3d 417, 421 (6th Cir. 2020) (Ohio law) ("It will not suffice for the insurer to demonstrate that its interpretation is more reasonable than the policyholder's. Instead, in order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction that it favors, but rather that such an interpretation is <u>the only one</u> that can fairly be placed on the language in question. If the policy is ambiguous, and the insured's interpretation is reasonable, the insured prevails") (emphasis in original); *Mitchell v. State Farm Fire & Cas. Co.,* 954 F.3d 700, 706 (5th Cir. 2020) (Mississippi law) ("Since (insured's) interpretation... must prevail if the term is ambiguous, we need only determine whether (the insured's) interpretation is a reasonable one - - not necessarily the most reasonable").

As discussed below, there are reasonable interpretations of both the "Business Income" portion of the policy and the "Civil Authority" portion of the policy that lead to the conclusion that the insured is entitled to coverage under both of those coverage parts by reason of the government's virus-related directives.

In opposing this motion for summary judgment, Travelers need not argue that there is also a reasonable interpretation of the policy language that leads to the conclusion that coverage does not exist. Toppers stipulates that that is true. The only issue is whether the policy interpretation set forth

3

in this memorandum is absurd or reasonable. If it is reasonable, which is manifestly the case, an ambiguity exists that must be resolved in favor of the insured.

## II. Coverage Exists Under the Insuring Agreement in the "Business Income" Portion of the Policy If the Operations Were Suspended Either (a) Because of a Direct Physical Loss, or (b) Because of Direct Physical Damage.

The prerequisite to coverage under the insuring agreement for "Business Income"[4] is that the suspension of the insured's operations have been caused by "direct physical loss of or damage to property" at the insured premises. Coverage exists (a) if Toppers suspended operations because of a direct physical loss of property, or (b) if Toppers suspended operations because of direct physical damage to property.[5] There is a reasonable interpretation of the policy language that leads to the conclusion that Toppers' suspension of operations was caused both by a direct physical loss and by direct physical damage. For two independent reasons, therefore, the prerequisites to coverage under the "Business Income" coverage part have been satisfied.

### A. Coverage Exists Under the Insuring Agreement in the "Business Income" Portion of the Policy Because There Has Been a Direct Physical Loss.

The insuring agreement for Business Income at P-40 of Exhibit A uses the phrase "physical loss of or damage to" property. The word "loss," can mean either of two things: (1) detriment/disadvantage, or (2) something that is lost (cannot be found). *See* Dictionary.com. Travelers will argue that the word "loss" in the Business Income insuring agreement, means something that is lost (cannot be found) because the word "loss" is used in conjunction with the word "of": the policy refers to "loss...of" property. Travelers' argument is without merit. The only thing that the words "loss of...property" can refer to is a "loss of" *use* of the property. In short,

---

[4]*See* Exhibit A at P-40 (the first page of the Business Income Coverage Form).
[5]The loss must also have been caused by a Covered Cause of Loss. *See infra* at pp 5, 8-9.

Travelers has used, in its policy, words that do not have a clear meaning, creating an ambiguity, and the ambiguity must be resolved in favor of the insured.

Focus on the Business Income insuring agreement. After stating that coverage can exist for "physical loss of ...property" <u>or</u> for "physical... damage to property," the insuring agreement then goes on to say that the "loss or damage" must be caused by or result from a Covered Cause of Loss. A Covered Cause of Loss means "direct physical loss." Exhibit A at P-51. As discussed above, a "loss" can mean a detriment/disadvantage or something that is lost. Putting that all together, the insuring agreement provides as follows:

A.      Coverage exists if the suspension of the insured's operations was caused by "direct physical loss of ...property" if the loss of property was caused by direct physical detriment to property.

AND

B.      Coverage exists if the suspension of the insured's operations was caused by "direct physical... damage to property" if the damage to the property was caused by direct physical detriment to property.

If, as Travelers contends, the words "loss of ... property" mean lost (cannot be found), the first of the foregoing coverages would not make sense. Replacing the words "loss of property" with property that has been "lost," would have the insurance agreement read as follows:

A.      Coverage exists if the suspension of the insured's operations was caused by property that has been lost if being unable to find the property was caused by or resulted from direct physical detriment to the property (or from being unable to find the property).

That makes no sense. One thing, therefore, is irrefutable. When the words "loss of" property are used in the Business Income insuring agreement, they mean something other than property that has been lost (cannot be found). What, then, do the words mean? The only other possible definition of the words "loss of" property is a loss of use of the property. (At minimum, that is a reasonable

interpretation.) That is true because it is only if the words "loss of ...property" mean loss of *use* that

the insuring agreement makes sense. The insuring agreement would reasonably read as follows:

> A.     Coverage exists if the suspension of the insured's operations was
>        caused by property that could not be used if the property could not be
>        used because of, or as a result of, direct physical detriment to
>        property.

At a minimum, that is a reasonable policy interpretation.

Summarizing, the words "loss of ... property" in the Business Income insuring agreement can

reasonably be interpreted to mean loss of use of the property. As discussed above, the policy affords

coverage if there has been "direct physical loss of or damage to property," the words "loss

of...property" mean something other than "damage to property;" and those words cannot mean

property that has been lost (cannot be found). When one speaks of a "loss of property," one is obviously

saying something different than a "loss to property." By the same token, when one speaks of a "loss of

property," one is obviously saying something different than "damage to property." Moreover, the insuring

agreement already states it applies to "damage to property." To give the words "loss of property" meaning, the

words have to mean something other than "damage to property." It is a fundamental rule of insurance contract

construction that the words used in a policy should not be given an interpretation that would render the words

superfluous. *E.g., Lower Paxton Tp. v. U.S. Fidelity and Guar. Co.,* 383 Pa. Super. 558, 557 A.2d 393, 402

(1989) (policy should not be interpreted so as to render a word in the policy ''surplusage''); *Continental Ins.*

*Co. v. McKain*, 820 F. Supp. 890, 897 (E.D. Pa. 1993), *judgment aff'd*, 19 F.3d 642 (3d Cir. 1994) (''when

there are alternative readings of a clause in a contract, the rule of construction is that the one that avoids

surplusage should be chosen'').

It is reasonable, therefore, to interpret the "loss of" property language to apply when there has

been a loss of use of the property. That gives the word "loss" meaning and takes into account the

existence of the word "of" in the policy language. As a result, it is reasonable to conclude that

coverage exists here because, by reason of the government directive, Toppers was unable to use its locations (the insured premises). And it is reasonable to say that there has been a "physical loss of property" because there has been a loss of use of the (physical) buildings.

Unsurprisingly, the case law is consistent with the foregoing analysis. Courts interpreting the same policy language at issue here have held that there can be a physical loss of a building without there having been a physical alteration of the building. It is enough that there has been a loss of use of the building. Illustrative cases include *Murray v. State Farm and Cas. Co.,* 203 W.Va. 477, 509 SE.2d 1, 17 (1998) ("'Direct physical loss'... may exist in the absence of structural damage to the insured property.... Losses... rendering the insured property <u>unusable</u> or uninhabitable" can be covered "in the absence of structural damage to the insured property") (emphasis added); *Sentinel Management Co v. New Hampshire Ins. Co.,* 563 NW.2d 296, 300 (Minn. App. 1997) ("Direct physical loss may exist in the absence of structural damage to the insured property....Although asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered <u>useless</u> by the presence of contaminants")(emphasis added); *Matzner v. Seaco Ins. Co.,* 9 Mass L. Rptr. 41, 1998 WL566658 (Sup.Ct. August 12, 1998) ("(T)he phrase 'direct physical loss or damage is ambiguous in that it is susceptible of at least two different interpretations. One includes only tangible damage to the structure of insured property. The second includes a wider array of losses") (collecting cases); *Motorist Mut. Ins Co. v. Hardinger*, 131 Fed. Appx. 823, 826 (3d Cir. 2005) ("direct physical loss or damage" requirement satisfied by e-coli, which had "reduced the <u>use</u> of the property to a substantial degree") (emphasis added); *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.,* 311 F.3d 226, 236 (3d Cir. 2002) (New York and New Jersey law) (The court held that there was a physical loss even though there had not been a physical alteration of the building):

> (T)he policies cover "physical loss," as well as damage. When the presence of large quantities of asbestos in the air in a building is such as to make the structure uninhabitable and <u>unusable</u>, then there has been a distinct loss to its owner. (Emphasis added).

Summarizing, the interpretation given the words "physical loss of property" by the foregoing courts is, at a minimum, reasonable. As made clear by the above discussion, it is reasonable to say that there is a "physical loss of" use of a building when the building cannot be used. Toppers' buildings could not be used between late March 2020 and July 2202 because of government directives. As a result, subject to one proviso, Toppers is entitled to coverage because its suspension of operations at the buildings was caused by the inability to use the buildings. The proviso is, as discussed above, because of the "Covered Cause of Loss" requirement, the government directive (the cause of the loss of use) must itself have been tied, at least in part, to direct physical loss": that is, tied to a physical detriment.[6]

The immediate cause of the business suspension was the government directive. The indirect (proximate) cause of the business suspension was the physical damage. The policy language does not (unambiguously) require that the immediate cause of the business suspension have been physical damage.  To the contrary, <u>any</u> cause will suffice. The policy requires only that the suspension of the insured's operations have been "caused by" physical damage. A "cause" can be direct, indirect, proximate, etc. At a minimum, therefore, the policy is ambiguous with regard to whether an indirect proximate cause is sufficient. That is, since the policy uses the word "caused" (instead of "directly caused"), the policy can reasonably be read to allow an indirect (proximate) cause to suffice. *E.g., SW Energy Corp v. Continental Ins. Co.,* 1999 UT 23, 974

---

[6]As discussed above, the dictionary definition of the word "loss" is "detriment."

P.2d 1239, 1243 (1999) (Exclusion eliminated coverage for damage "caused by" corrosion. Court held that "caused by" unambiguously included damage even indirectly caused by corrosion, since "the language of the policy does not distinguish between direct and indirect losses").

The casual connection between the government's directives and the physical detriment exists because (1) the loss of use of the insured's premises was caused by the governments' closure and stay-at-home directives, and (2) consistent with the discussion in the next section of this memorandum, the governments' directives resulted, in part, from a physical detriment to property, namely a virus on building surfaces in the areas where Toppers operated in Pennsylvania, Delaware and New Jersey.[7]  The Pennsylvania Supreme Court upheld the Governor's stay home order of March 19, 2020, because "the virus can live on surfaces for up to four days," thereby assisting in the spread of the disease and justifying emergency closure of Toppers' building. *Friends of Danny DeVito v. Tom Wolf,* 227 A.3d 872, 891(Pa. 2020) (citations omitted). The connection would exist, however, even if there had not actually been a virus on building surfaces in the areas in which Toppers' operated. The policy's definition of "covered cause of loss" is satisfied merely by the "risk of direct physical loss." Exhibit A at P-51. Enclosed as Exhibit G are copies of industry-standard Insurance Services Office policy forms, which define the term "covered cause of loss" as a "direct physical loss" and do <u>not</u> include the word "risk," contrary to Travelers' usage. For example, paragraph 3, on the second page of the Business Income Coverage Form (Exhibit G), defines "Covered Cause of Loss" as is set forth in the "Causes of Loss" form, which in turn defines a Covered Cause of Loss as a "direct physical loss," rather than "risk of direct physical loss".

---

[7] The presence of the virus on building surfaces constitutes "damage" to the building. *Infra* §II.B. Even if, however, the virus on a building surface does not constitute "damage" to the building, it is certainly reasonable to say that the virus on a building's surface constitutes a "detriment" to the building.

Travelers' inclusion of the word "risk" must be given effect, and it cannot be the same meaning that it would have had if the word "risk" had not been used. *See, e.g., Lower Paxton Tp* 557 A.2d at 402 (policy should not be interpreted also as to render a word in the policy "surplusage"). Accordingly, the "covered cause of loss" requirement was satisfied merely by the fact that the governments' closure and stay-at-home directives were caused, in part, by the <u>risk</u> of a physical detriment to property.

**B. Coverage Exists Under the Insuring Agreement in the "Business Income" Portion of the Policy Because There Has Been Direct Physical Damage.**

The virus is on surfaces, including building surfaces, from which the virus can come into contact with people. The question, therefore, insofar as coverage is concerned, is whether the virus, when it is on building surfaces, constitutes damage to the building. The answer is yes it does. As a result, coverage exists not only because of the "loss of" language in the policy (discussed above), but also because of the "damage" language in the policy.

Courts around the country are split with regard to whether the words "physical damage" require a physical alteration of an object, or whether it is enough that there has been a physical change of condition. *See Port Authority of New York and New Jersey*, 311 3d at 236. A well-reasoned case adopting the latter rule is *Oregon Shakespeare Festival Assn. v. Great American Ins. Co.*, 2016 WL 3267247 (D. Or. March 16, 2017), vacated by stipulation of the parties, 2017 WL 1034203. In that case, smoke, soot and ash from wildfires "accumulated on the surface of the hard plastic seats and concrete ground of (the insured's) open air theater." The insured sought business income loss coverage for the performances that were cancelled "due to poor air quality and the related health concerns," even though the soot and ash "had been cleaned up... well before any scheduled performances...."

The policy in the *Great American* case conditioned coverage on the suspension of the insured's operations having been "caused by direct physical loss of or damage to property at the (insured) premises...." The insurance company denied coverage because there had not been "any permanent or structural damage to (the insured's) property." The court held in favor of the insured.

In this case, the parties disagree over the term "direct physical loss of or damage to covered property."

x   x   x

(The insured) defines the term in question by relying on Webster's dictionary, defining "physical" as "of or belonging to all created existence; relating to or in accordance with the laws of nature; of or relating to natural or material things as opposed to things mental, moral or spiritual.... (The insured) distills this definition down to mean a "natural or material thing." "Loss" is defined as the "state or act of being destroyed or placed beyond recovery" or the amount of an insured's financial detriment due to occurrence of a stipulated event..." Id. "Damage" means "loss due to injury;" injury or harm to person, property, or reputation." Id. (The insured) asserts that these definitions, taken together, create a plain meaning of "physical loss or damage" as "any injury or harm to a natural or material thing." Based on this interpretation, (the insured) claims that the wildfire smoke caused injury or harm to the interior of the theater, which include the air within the theater.

x   x   x

In *Farmers Ins. Co. of Oregon v. Trutanich*, 123 Or. App. 6, 858 P.2d 1332 (1993), the Oregon Court of Appeals was asked to determine whether or not a "pervasive odor" in a residential home caused by a subtenant's illegal methamphetamine operation was considered a "direct physical loss".... (The court held that it was a direct physical loss.)

*Trutanich* was cited favorably along with *Largent v. State Farm Fire & Cas. Co.*, 116 Or.App. 595, 842 P.2d 445(1992), by District of Oregon Judge Hubel to stand for the proposition that "physical damage can occur at the molecular level and can be undetectable in a cursory inspection." *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, 1999 WL 619100, at *6 (D. Or. Aug. 4, 1999).

x   x   x

Additionally, this Court finds a District of New Jersey case to be extremely persuasive based on the similarities of the facts and the insurance policy terms at issue. In *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2014 WL 6675934, at *3 (D.N.J. Nov. 25, 2014), an accidental release of ammonia into a packaging facility caused the facility to be shut down for one week while the ammonia dissipated. The evidence in the record showed that in order to remedy the problem, the facility had to "air the property" and hire an outside company "to do the cleanup... Wash down anything with water ... [They] brought in dry ice, trying to neutralize the [ammonia] inside the plant. Set up fans and all that." *Id.* at *4. The

11

defendant insurance company asserted that the incident was not covered because "physical loss or damage" necessarily involves a "physical change or alteration to insured property requiring its repair." *Id.* at \*2. The court disagreed, noting that "while structural alteration provides the most obvious sign of physical damage," various courts have found "that property can sustain physical loss or damage without experiencing structural alteration." *Id.* at \*5. *See also Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 406 N.J. Super. 524, 543, 968 A.2d 724, 736 (App. Div. 2009) (holding that property can be physically damaged, without undergoing structural alteration, when it loses its essential functionality). The court concluded that the packaging facility incurred "physical loss or damage" when ammonia gas was discharged into the facility's air... and rendered the facility temporarily unfit for occupancy." *Id.* at \*8.

Other courts around the country have held that damage does not have to be "structural" to be "physical," as long as it renders the property unusable for its intended purpose. *See, e.g., Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 437 P.2d 52 (1968) (where gasoline vapors penetrated the foundation of the insured church and accumulated, rendering building uninhabitable, the property was held to have suffered a "direct, physical loss"); *Matzner v. Seaco Ins. Co.*, 1998 WL 566658 (Mass. Super. 1998) (holding that carbon monoxide levels in an apartment building sufficient to render building uninhabitable were a "direct, physical loss").

x   x   x

In this case, wildfire smoke infiltrated the interior of the theater, making it uninhabitable and unusable for holding performances. Like the home infiltrated by methamphetamine odor, or the furnace contaminated by lead particles, or the facility filled with ammonia, the theater filled with smoke was unusable for its intended purpose. Even though the loss or damage was not structural or permanent, the property experienced a loss of "essential functionality."... Based on the case law, as discussed above, the Elizabethan Theatre sustained "physical loss or damage to property" when the wildfire smoke infiltrated the theater and rendered it unusable for its intended purpose.

*Id.* at \* 5, 7-9.  *Accord, e.g., Travco Ins. Co. v. Ward*, 715 F. Supp.2d 699, 703, 707–708 (ED Va 2010):

The Ward Residence contains walls that were constructed using sheets of Chinese Drywall ("the Chinese Drywall"). Over time, the Chinese Drywall in the Ward Residence has released sulfuric gas into the residence.

x   x   x

With regard to the claim for the cost of removing the Chinese Drywall, (the insurer) argues that "the Drywall has not sustained a 'direct physical loss,' and therefore does not fall within the grant of coverage in the Policy....

x   x   x

The parties disagree as to whether the Ward Residence has suffered a "direct physical loss".... (The insurer) argues that there has been no direct physical loss

12

because the Drywall is "physically intact, functional and has no visible damage."...

The court find that the Ward Residence has suffered a direct physical loss, based on a review of the relevant precedent.

x   x   x

The majority of cases appear to support (the insured's) position that physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces. For example, in *Hughes v. Potomac Insurance Co.*, 199 Cal. App.2d 239, 18 Cal. Rptr. 650 (1962), the land around the insured's home fell away in a landslide, leaving the home perched on a cliff. The court held that this constituted a physical loss to the dwelling, stating as follows:

> To accept (the insurer's) interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such a position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.

> *Id.* at 248–249, 18 Cal. Rptr. 650; *see also Essex v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) (applying Massachusetts law and finding that unpleasant odor was physical injury to property); *Motorists Mutual Ins. Co. v. Hardinger*, 131 Fed.Appx. 823, 825–27 (3d Cir.2005) (applying Pennsylvania law and finding that bacteria contamination of well water would constitute direct physical loss to house if it rendered it unusable); *Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 437 P.2d 52, 55 (1968) (en banc ) (gasoline fumes which rendered church building unusable constitute physical loss); *Farmers Ins. Co. of Oregon v. Trutanich*, 123 Or.App. 6, 858 P.2d 1332, 1336 (1993) (cost of removing odor from methamphetamine lab constituted a direct physical loss); *Murray v. State Farm Fire & Cas. Co.*, 203 W.Va. 477, 509 S.E.2d 1, 17 (1998) (home rendered unusable by increased risk of rockslide suffered direct physical loss even in the absence of structural damage).

In support of its argument that physical damage requires some physical alteration or injury to the property's structure, (the insurer) cites a number of cases from other jurisdictions. The cases (the insurer) cites are all readily distinguishable, however, in that they do not involve situations in which the property in question was rendered

13

unusable. (Citations omitted.)

*Pepsico, Inc. v. Winterthur Intern. American Ins. Co.*, 24 AD.3d 743, 896 NYS.2d 709, 711 (2d

Dep't 2005):

> We reject Winterthur's contention that the plaintiffs' products were not 'physically damaged' under the ... policy issued by Winterthur. While 'physical damages' are not defined in the policy, we disagree with Winterthur that to prove 'physical damages' the plaintiffs must prove that 'there has been a distinct demonstrable alteration of the physical structure (of the plaintiffs' products) by an external force,' in other words, that the product has gone from good to bad. It is sufficient under the circumstances of this case involving the unmerchantability of beverage products that the product's function and value have been seriously impaired, such that the product cannot be sold.

Although it would be reasonable to interpret the "physical damage" language more narrowly

than the foregoing courts have interpreted that language, the interpretation given those words by

those courts is reasonable. Necessarily, therefore, at a minimum, the policy language is ambiguous,

and the ambiguity must be resolved in favor of the insured. Accordingly, coverage exists because (a)

due to the virus[8] (which either was already in the building, or would inevitably have entered the

building), the government required that the business operations in the building cease, and (b) the

existence of the virus constituted physical damage because virus on the building's surfaces

physically changed the condition of the surfaces.

### III.   Coverage Exists Under the Insuring Agreement in the "Civil Authority" Portion of the Policy.

Paragraph A.3.a. of the Business Income Coverage Form, titled "Civil Authority," affords

coverage for Business Income if (1) the operations were suspended because of the "action of civil

authority that prohibits access to the" insured premises, (2) the civil authority's denial of access

---

[8]As discussed *supra* at 8, the immediate cause of the business suspension was the government directives, and the indirect (proximate) cause of the business suspension was the physical damage, but the policy language does not (unambiguously) require that the immediate cause of

14

constituted a "response to dangerous physical conditions resulting from the damage or continuation

of the Covered Cause of Loss[9] that caused the damage," (3) there has been damage to property "other

than property" at the insured premises (but within one mile of the insured premises), and (4) access

was also prohibited near the damaged property. Exhibit A at P-41.

Travelers admits the first requirement has been satisfied in its denial of coverage letter: "We

have confirmed the Governmental Order required closure of your business and prohibited access to

the described premises." Exhibit F at p. 3.

The second, third and fourth requirements have also been satisfied. The government acted as

it did, in part, because the virus was on surfaces throughout the locales in which Toppers operated (a

dangerous condition), necessarily including surfaces within one mile of Toppers' buildings.

Moreover, as discussed *supra* at section III.B, the presence of the virus on those surfaces not only

constituted physical damage to property but the government also prohibited access at those locations.

Necessarily, therefore, coverage exists under Civil Authority portion of the policy.

## IV. Toppers Does Not Have to Prove That the Virus Was Present in its Buildings on the Day That Toppers Suspended Operations.

As discussed *supra* at section II.A, (a) because of the government directives, Toppers'

buildings could not be used on the day that Toppers suspended operations, (b) since the buildings

could not be used, the policy's "loss" coverage was triggered, and (c) the buildings could not be used

whether or not the virus was present in the buildings. All that is necessary is that there have been a

loss of use of Topper's buildings.  Necessarily, therefore, Travelers could not deny coverage under

the "loss of property" portion of the policy even if Toppers cannot prove that there was a virus in its

---

the business suspension have been physical damage. To the contrary, <u>any</u> cause will suffice.
[9]A Covered Cause of Loss is defined, in relevant part, as "risk of direct physical loss." Exhibit A
at P-51.

buildings. It is enough that one of the reasons for the government's shut down order was property damage (arising for example from the presence of the virus on surfaces in the buildings for up to four days, as the Pennsylvania Supreme Court noted in *Wolf,* 227 A.2d at 891).

Similarly, as discussed *supra,* in section III, Toppers is entitled to coverage because the virus was within one mile of Toppers' buildings. It is not necessary in order for coverage to exist under the "Civil Authority" portion of the policy that the virus have been in Toppers' buildings.

The only question is whether the third, independent, reason for the existence of coverage - - the coverage based upon "damage" (*see supra* section II.B.) - - also exists whether or not there was virus in Toppers' buildings on the date that Toppers suspended its operations. For the reasons discussed below, the answer is yes; Toppers is entitled to "damage" coverage regardless of whether there had been a virus in Toppers' buildings.

The policy requires that the business suspension have been caused by physical "damage" to property. The policy is ambiguous because the policy does not state whether the suspension had to have been necessary because of existing damage, or whether it would be enough that the suspension was necessary because of inevitable future damage. The policy language states as follows:

> The suspension must be "caused by... damage...."

The ambiguity arises out of the fact that that language can reasonably mean two different things.

> The suspension must be "caused by ... damage" that already exists

Or

> The loss must be "caused by...damage" that already exists or that will exist.

The point is that <u>something</u> has to be added to the language of the policy as written. It will be the insurer's position that the "already exists" requirement is implicit from the language. It is the insured's position that, since <u>something</u> has to be added, why not the "already exists or that will

16

exist" language?

In other words, while it is certainly reasonable to interpret the policy language to require that the damage have already existed, it is also reasonable - - not nonsensical - - to interpret the policy language to require only that the suspension be the result of property damage regardless of when the damage takes place. Normally, of course, one would not suspend one's operations because of damage that did not exist; as a result, when reading the policy language, one would not initially think of future damage as being something that can cause a suspension. But future inevitable property damage <u>can</u> cause a suspension, as it did in the matter at hand. And there is nothing in the policy language that unambiguously excludes coverage when a business' operations are, in fact, suspended because of inevitable property damage.

Just as existing property damage is <u>known</u>, inevitable future property damage is <u>known.</u> Under either scenario, therefore, one would be suspending operations because of <u>known</u> property damage. It is reasonable to say, therefore, under either scenario, that "the suspension was caused by <u>damage</u>."

Another way to reach the same conclusion - - that when one uses the word "damage," one might possibly be speaking of inevitable damage - - is to consider common parlance in a hypothetical. Suppose that Mr. Smith suspends his business on January 1 because a hurricane is on its way. Mr. Smith is later asked whether he suspended his business on January 1 because the business had been losing money. Mr. Smith responds that the suspension of his business on January 1 had been "caused by a hurricane." Mr. Smith's words are ambiguous. The suspension might have been caused by a hurricane that had already hit his building, or the suspension might have been caused by a hurricane that had not yet hit his building. The word "hurricane" can refer to a hurricane that had already taken place, or the word "hurricane" can refer to a hurricane that was inevitable. For

17

the same reasons, the word "damage" can refer to damage that has already taken place, or the word "damage" can refer to damage that was inevitable.

As was true of Mr. Smith in the hurricane hypothetical, the governments could have caused Toppers to suspend its business because of damage that had already taken place, or the governments could have caused Toppers to suspend its business because of the inevitability that damage was otherwise going to take place. In either event, it would be possible to say that the government orders and, therefore, Toppers' suspension of operations was "caused by damage."

Stated another way, begin with the fact that it is reasonable to say (a) that the government directives were caused, in part, by their concern that, absent a closing of the buildings to business, the building would inevitably become infested with virus, and (b) that as a result, the government directives can be said to have been caused by property damage (as that term is defined by the court decisions discussed above). It is reasonable to say, therefore, that one cause of Toppers' suspension of operations was property damage because one cause of the governments' directives was property damage.

Necessarily, and particularly as applied to the instant facts, the words "caused by damage" in the insurance policy are ambiguous. Although it is certainly very reasonable to add the words "that already exists" to the policy language, it is also reasonable not to add those words.

Finally, the policy interpretation being proffered by Travelers is nonsensical, as illustrated by the following hypothetical. Suppose that an insured owns a factory, and the insured notices that one of the machine parts will break in 5 minutes unless the machine is shut down. As a result, the insured immediately shuts down the machine and suspends his operations for a week until the replacement machine part is obtained. In that scenario, there was no property damage prior to the suspension of operations. Now suppose that the insured had continued to run the machine for 5 minutes until the

18

part broke. Under the latter scenario, the insured would be entitled to coverage for the week that he suspended his operations because the suspension would have been caused by damage that had already existed. Under the former scenario, is the insured not entitled to coverage for the week that he suspended his operations because he did not wait the 5 minutes for the part to break before suspending his operations?

Similarly, in the matter at hand, Travelers' position is that Toppers would have been entitled to coverage if the government had acted irresponsibly and issued a stay-at-home order later, after the virus was everywhere. But, since the government acted responsibly, moving up the date of Toppers' suspension of operations by a couple of weeks, Toppers is not entitled to coverage. It would be a strange kind of argument and an equivocal type of justice that would hold that Travelers would have been obligated to pay for Toppers' suspension of operations if the suspension had commenced later than it should have commenced, but Travelers is not obligated to pay for Toppers' suspension of operations because the suspension commenced at the correct time.

The Pennsylvania Supreme Court's decision in *Leebov v. United States Fidelity & Guaranty Co,* 401 Pa. 477, 165 A.2d 82, 84-85 (1960), is consistent with the foregoing common sense analysis. The policy afforded coverage solely for the costs of remedying property damage that had already taken place. Property damage (a landslide) had taken place, but the insured sought reimbursement for the money spent to prevent additional (future) landslide damage - - that is, coverage was sought for property damage that had not yet taken place. The court, applying a fairness test, held that the insured was entitled to coverage.

> If the plaintiff [insured] had not taken immediate and substantial measures to remedy the perilous situation, disastrous consequences might have befallen the adjoining and nearby properties. If that had happened, the defendant [insurer] would have been required to pay considerably more than is involved in the present lawsuit. It would be a strange kind of argument and an equivocal type of justice which would

19

hold that the defendant would be compelled to pay out, let us say, the sum of $100,000 if the plaintiff had not prevented what would have been inevitable, and yet not be called upon to pay the smaller sum which the plaintiff actually expended to avoid a foreseeable disaster. That the danger to the neighborhood was one of considerable substance is evidenced by the fact that the City authorities required the nearby owners to vacate their premises for a period of two months.

It is folly to argue that if a policy owner does nothing and thereby permits the piling up of mountainous claims at the eventual expense of the insurance carrier, he will be held harmless of all liability, but if he makes a reasonable expenditure and prevents a catastrophe he must do so at his own cost and expense.

*Accord Aronson Associates, Inc v. Pennsylvania Nat. Mut. Cas Ins. Co.*, 14 Pa. D&C.3d 1, 1977 WL 181 (C.P. 1977), aff'd, 272 Pa. Super. 606, 422 A.2d 689 (1979) ("preventive measures can be recovered where they are required to protect against a third person being harmed").

For that additional reason, therefore, it is not necessary, even under the "damage" portion of the policy, that Toppers prove that there had been a virus on surfaces in its buildings prior to the suspension of its business.

## V.   The Virus Exclusion Does Not Eliminate Coverage for the Insured's "Continuing Operating Expenses."

Since, as discussed above, coverage exists under two of the insuring agreements in the insurance policy, the next question that has to be addressed is whether an exclusion is applicable. The answer is no.

The policy includes an endorsement that "we will not pay for loss or damage caused by …any virus…." Exhibit A at P-81. Coverage under the policy, however, is not limited to "loss or damage." Coverage also exists for "continuing normal operating expenses." Specifically, coverage is afforded for any loss of "business income," and the policy defines that term to include not only "losses" (lost income), but also "continuing normal operating expenses." *Id.* P-40. Paying one's rent/mortgage/employees is not a "loss or damage." Such a payment is a business expense. And just

as paying one's employees the amounts owed under their employment contracts (or paying one's rent) was not a "loss or damage" prior to the virus' appearance, paying one's employees (or one's rent) is not a "loss or damage" after the virus' appearance. At the very least, it is reasonable to interpret a "continuing operating expense" to be an expense as opposed (solely) to a "loss or damage."

A hypothetical illustrates the point. Suppose that, after the virus' appearance, the insured did not lose any income. The insured would not have a "loss or damage." Under the terms of the policy, however, the insured would still be entitled to coverage for his or her "continuing operating expenses." The insured would be entitled to "operating expense" coverage even though the insured did not have a "loss" - - that is, "operating expense" coverage would be owed even though the insurance company did not have to afford coverage for "loss or damage." In fact, it is not unusual for insurance policies to afford coverage even though the insured has not incurred a loss. *See*, for example, the discussion in Windt, section 11.34, page 11-634.

> Disability policies insure against the loss of capacity to do certain work, not against loss of income. It is irrelevant, therefore, under a typically worded disability policy, even if the insured can get another job for higher pay.

*See also Aetna Cas. & Sur. Co. v. Valley Nat. Bank of Ariz.*, 15 Ariz. App. 13, 485 P.2d 837, 840 (Div. 1 1971) (Insured's policy covered theft of funds. Money was stolen out of the insured's bank account. The insured was reimbursed by the bank, but the insured (and the entity to which she had assigned her insurance claim) were still entitled to collect the insurance since, under the terms of the policy, an insurable loss had taken place); *Gustafson v. Central Iowa Mut. Ins. Ass'n*, 277 N.W.2d 609, 612-13, 7 A.L.R.4th 484 (Iowa 1979) (collecting 12 cases from around the country holding that the insured was entitled to collect insurance even though, by virtue of a third party's payment to the insured for the same loss, the insured ended up with a double recovery); *Wolf v. Home Ins. Co.*, 100

21

N.J. Super. 27, 241 A.2d 28, 38-39 (Law Div. 1968), *judgment aff'd*, 103 N.J. Super. 357, 247 A.2d 345 (App. Div. 1968) (Insured had contracted to sell his property prior to a fire, and after the fire, the insured received the full contract price. Nevertheless, the court held that the insurance policy had to be applied as written, so that the insured was entitled to all of the policy benefits. The policy language called for paying the insured his loss, and the time of the loss under the policy language was the date of the fire, not the subsequent date when the insured was paid by the buyer); *New Ponce Shopping Center, S.E. v. Integrand Assur. Co.*, 86 F.3d 265, 268-69 (1st Cir. 1996) (insured is entitled to coverage when a building that the insured intends to demolish is destroyed by fire).

By the same token, if, by reason of an exclusion, Travelers were not obligated to afford coverage for "loss or damage," that would not change the fact that Travelers would still be obligated to afford "operating expense" coverage - - the only coverage being sought in the matter at hand.

It would have been different if the exclusion had been written to eliminate any coverage that would otherwise have existed. For example, the American Association of Insurance Services has issued a virus exclusion endorsement, form CL0700 1006, that states (1) that it "applies to all coverages... that are provided by the policy," and (2) that it applies to "loss, cost or expense." *See* Exhibit H. That is not, however, what the Travelers chose to do. At the very least, it is reasonable to read the Travelers exclusion as applying solely to claims for "loss or damage," and not to claims that are not for "loss or damage."

There is an inconsistency in the insurance policy. The insuring agreement states that there is coverage for "the actual loss of 'business income.'" The definition of "business income" in the policy, however, does not limit the coverage to an insured's "losses." The policy defines "business income," in relevant part, as follows:

> Business income means net income ... plus continuing normal operating expenses.

If one plugs that definition into the insuring agreement, the policy would read as follows:

Coverage exists "for the actual loss <u>of</u> net income."
AND
Coverage exists "for the actual loss <u>of</u> continuing operating expenses."

The latter language does not even make sense. There can be a loss <u>from</u> continuing operating expenses, but there is no such thing as a loss <u>of</u> continuing operating expenses. Moreover, if the word "of" were changed to "from," the coverage would be materially different. For example, in the hypothetical discussed above, the insured would no longer be entitled to coverage if the government replaced the insured's lost revenues. In other words, in order to cause the exclusion to apply to "continuing operating expenses," a court would have to rewrite the policy in order to make it more favorable to the insurer, something courts are not allowed to do.

Further proving the point, the Business Income insuring agreement in the policy is not the only insuring agreement in the policy that expressly creates coverage for expenses over and above the coverage afforded for loss/damage. Paragraph A.4.a., on the third page of the Building Coverage Form, creates coverage for debris removal "expenses." Exhibit A at P-22. Similarly, paragraph A. 2. on the first page of the Business Income Coverage Form provides coverage for various expenses. *Id.,* P-40. Manifestly, an exclusion that is limited to eliminating coverage solely for loss/damage is not an exclusion that eliminates coverage for those "expenses."

Travelers will likely argue that when the exclusion states that "we will not pay for loss or damage" caused by a particular risk, what is meant is that the insurer "will not pay for" the loss or damage <u>to property</u> that <u>gives rise to</u> the insured's loss/damage; what is not meant is that the insurer "will not pay for" the insured's loss/damage. Even if that policy interpretation were reasonable, however, it is also reasonable to interpret the "loss or damage" language to refer to the insured's

23

loss/damage. As discussed in *Oregon Shakespeare Festival Assn. v. Travelers Ins. Co.*, 2016 WL 3267247 at *5, the word "loss" can be used to refer to "the amount of an insured's financial detriment, "and the word "damage" can be used to refer both to "loss due to injury" and to "harm to (a) person."

If the exclusion had been intended to mean what the insurer contends that it means, the exclusion would have stated that "we will not pay if the loss or damage (giving rise to the insured's loss/damage) is caused by a particular risk. The exclusion, however, uses the word "for": "we will not pay <u>for</u> loss or damage caused" by a particular risk. The word "for" indicates that the loss/damage being referred to is the loss/damage that the insurer is being asked to pay, not to the loss/damage that gave rise to the loss/damage that the insurer is being asked to pay.

Alternately stated, one reasonable interpretation of the word "for" is "as the equivalent of." The insurer will, absent an applicable exclusion, pay "for" the insured's loss/damage; the insurer will pay an amount as the equivalent of the insured's loss/damage.

The decision in *Farmers Texas County Mutual Insurance Company v. Zuniga*, 548 SW.3d 646, 652-53 (Tex. App. San Antonia 2017), is illustrative. In that case, the policy afforded coverage for damages "for" bodily injury, not for damages "arising out of" bodily injury. As a result, coverage did not exist for punitive damages. "The plain meaning of the word 'for' is 'in exchange as the equivalent of' .... Thus, the Policy's promise to pay damages for bodily injury was Farmer's commitment to pay a sum of money as compensation in exchange as the equivalent of the physical damage to the injured person's body." *See generally Cincinnati Ins. Co v. H.D. Smith, LLC*, 829 F.3d 771, 774 (7th Cir. 2016).

> The policy that Cincinnati issued to H.D. Smith covers suits seeking damages "because of bodily injury." Such a policy provides broader coverage than one that covers only damages "for bodily injury." *Medmarc Cas Ins. Co v. Avent Am., Inc.*

24

612 F.3d 607, 616 (7th Cir. 2010) (applying Illinois law). We expressed that result with the following example:

> (A)n individual has automobile insurance; the insured individual caused an accident in which another individual became paralyzed; the paralyzed individual sues the insured driver only for the cost of making his house wheelchair accessible, not for his physical injuries. If the insured driver had a policy that only covered damages "for bodily injury" it would be reasonable to conclude that the damages sought in the example do not fall within the insurer's duty. However, if the insurance contract provides for damages "because of bodily injury" then the insurer would have a duty to defend and indemnify in this situation. *Id.*

*Greenwood Cemetery, Inc v. The Travelers Indem. Co.*, 238 Ga. 313, 316, 232 SE.2d 910, 913

(1977), also addresses the issue:

> The word "for" has numerous meanings. The insurer would read the word "for" as meaning 'equivalent to' (and therefore not greater than) or 'to the amount, value or extent of.' The insured would read the word "for" as meaning 'by reason of' or 'because, on account of.' *See* Blacks's Law Dictionary (Rev. 4th Ed., 1968); Webster's Third New International Dictionary 1967. *See also Lumbermens Mutual Casualty Co v. Yeroyan*, 90 N.H. 145, 5 A.2d 726 (1949); *American Ins. Co v. Naylor,* 103 Colo. 461, 87 P.2d 260 (1939).

By analogy, here the subject exclusion does not state that "we will not pay <u>as a result of</u> (arising out of) loss or damage caused" by a particular risk. The exclusion states that "we will not pay for loss or damage" (we will not make a payment equivalent to the loss or damage) if the loss/damage (that the insurer would otherwise have had to make a payment for) is caused by a particular risk.

Note, too, the first sentence of paragraph A.1.c. in the Business Income Coverage Form, uses the word "loss" to refer to the "loss of business income you sustain." Exhibit A at P-40. It does not refer to the "loss that the property sustains." It is the next sentence that refers to a "loss" to property. For that additional reason, the word "loss" in the exclusion can refer either to the insured's loss or to a loss to property. The exclusion is ambiguous. And as discussed above, since the exclusion applies

only to an insured's loss, the exclusion does not apply to an insured's continuing expenses, since continuing expenses do not constitute a loss.

Summarizing, the fact that the policy excludes coverage for an insured's loss/damage does not mean that the policy excludes coverage for an insured's "expenses." In addition, by the same token, it is reasonable to read the words "loss or damage" in the virus exclusion to be addressing the amount owed by the insurer. That is, it is reasonable to read the exclusion to be addressing what the insurer owes to the insured - - for the insured's loss or damage - - as a result of the underlying loss or damage to property. The words "loss or damage" in the exclusion are not addressing the loss/damage that gave rise to the insured's loss/damage.

For the foregoing reasons, the virus exclusion eliminates coverage for a claim for lost income (a "loss"). The exclusion does not (unambiguously) eliminate coverage for continuing operating expenses (which do not unambiguously constitute a "loss").

## VI. If Toppers Were Not Entitled to Coverage for "Continuing Operating Expenses," The Coverage Afforded by the Policy Would Be Illusory.

As discussed above, the policy affords coverage for "Business Income," and the policy defines that term to include two things: (1) lost income, and (2) "continuing normal operating expenses." Exhibit A at P-40. Plugging each part of the definition into the insuring agreement, the policy reads as follow:

> We will pay the actual loss of profits you sustain due to the necessary suspension of your operations.
> AND
> We will pay the actual loss of "continuing normal operating expenses" you sustain due to the necessary suspension of your operations.

The latter coverage is nonsensical. Continuing expenses are never owed because of ("due to") a suspension of operations; they are owed despite a suspension of operations. For example, monthly

26

rent that an insured has to pay is never owed because of a suspension of operations; the monthly rent has to be paid despite a suspension of operations. Moreover, not only is the policy language nonsensical, but if the "loss of" operating expenses "due to a suspension of operations" requirement were enforced as written, the coverage for operating expenses would be illusory.

A hypothetical illustrates the point. Suppose an insured suspends its operations at the insured premises because an explosion destroys the building. Manifestly, the insured would be entitled to coverage for its continuing operating expenses because (a) those expenses are encompassed by the policy's definition of "Business Income,"[10] and (b) the insured's Business Income claim was "due to the necessary suspension of your operations ...." Nevertheless, the insured in the hypothetical would not be able to collect for its continuing operating expenses because those expenses were not owed because of the suspension of operations. The insured's obligation to pay its expenses (e.g., rent) was not "due to" the suspension of operations. In fact, the insured's obligation to pay its continuing expenses has nothing whatever to do with the suspension of operations. Accordingly, under the terms of the policy, an insured's continuing expenses can <u>never</u> be covered because the expenses can never constitute a loss due to a suspension of operations.

A court has only two options for dealing with claims for "continuing normal operating expenses": either

> (1) allow the insured to recover those expenses even though continuing expenses (e.g., the monthly rent) are <u>never</u> "due to the necessary suspension of... operations"- - e.g., the rent has to paid whether or not there was a suspension of operations.
>
> or
>
> (2) never allow the insured to recover those expenses - - effectively rewriting the policy to change the definition of "Business Income" to delete the portion defining the term to include "continuing operating expenses" - - because continuing expenses are never due to a

---

10 It is irrelevant, in the hypothetical, whether the insured incurred a loss of profit.

suspension of operations.

The Court must adopt the first option because if the Court were to hold that coverage could never exist for "continuing normal operating expenses" because continuing normal expenses can never be a loss caused by a suspension of operations, the coverage for continuing normal expenses would be illusory. That is, adopting the second option set forth above would mean that although the policy expressly affords coverage for continuing normal expenses, the policy will never, in fact, afford coverage for continuing expenses. As discussed in Windt, section 6.2, page 6-48, it is a fundamental principle of insurance law that a court will not interpret a policy to create illusory coverage.

(A) court will not allow an exclusion to eliminate coverage that is expressly and specifically provided for in the same policy form. More generally stated, a policy will not be interpreted to create illusory coverage. Among the cases cited in Windt and the 2020 supplement *are Glen Lincoln, Inc. Zurich Ins. Co.*, 945 F. Supp. 844 (E.D. Pa. 1996), *affd in part rev'd in part*, 142 F.3d 428     (3d Cir. 1998) ("The law does not countenance illusory coverage"); *Monticello Ins. Co. v. Mike's Speedway Lounge, Inc.*, 949 F. Supp. 694, 699 (S.D. Ind. 1996) ("an insurance policy provides illusory coverage when a premiums was paid for coverage which would not pay benefits under any reasonably expected set of circumstances"); *Hullverson Law Firm, P.C. v. Liberty Ins. Underwriters, Inc.*, 25 F.Supp.3d 1185, 1191-95 (E.D. Mo. 2014) (coverage illusory because "the policy's definition of personal injury appears to provide coverage for (the insured's) advertising activities, but the definition of wrongful act then takes that coverage away); *Sletten & Brettin Orthodontic, LLC v. Continental Cas. Co.*, 782 F.3d 931, 938 (8th Cir. 2015) (Minnesota law) ("illusory coverage doctrine operates as a remedy where an insured seeks coverage under a provision that purports to provide coverage but such coverage turns out to be functionally nonexistent"); *McAninch v.Wintermute*, 491 F.3d 759, 769–70 (8th Cir. 2007) (Arkansas law) (Insurer's policy interpretation rejected because "(i)f the policy only provides coverage to directors sued solely because of their status . . . language (in the policy) is rendered nugatory"); *Pharmacists Mut. Ins. Co. v. Myer*, 2010 VT 10, 993 A.2d 413, 418 (Vt. 2010) (Exclusion for defamatory statements that the insured "had reason to believe" were false did not bar coverage for negligently made defamatory statements because such an interpretation "would virtually eviscerate the coverage provision for" defamation); *First National Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 981 (7th Cir. 2007) (Wisconsin law) (exclusion not enforceable because it operated as a "complete cancellation of (the) coverage granted in the insuring agreement"); *Radil v. National Union Fire Ins. Co. of Pittsburgh, Pa.*,

28

207 P.3d 849, 857 (Colo. App. 2008), *cert. denied*, 2009 WL 1383815 (Colo.2009) (Policy affords coverage for non-owned vehicles, but policy's definition of non-owned vehicles did not include vehicles that were not owned, leased, rented or borrowed. Coverage for non-owned vehicles was held to be illusory); *Murray Ohio Mfg. Co. v. Continental Ins. Co.*, 705 F. Supp. 442, 444 (N.D. Ill. 1989) ("the law does not countenance illusory coverage"); *Liberty Life Ins. Co. v. Commercial Union Ins. Co.,* 857 F.2d 945, 951 (4th Cir. 1988) (policy will not be interpreted so as to make any of the coverage given "illusory"); *Schwartz v. State Farm Mut. Auto. Ins. Co.,* 174 F.3d 875, 879 (7th Cir. 1999) (Indiana law) ("an insurance provision is considered illusory if a premium was paid for coverage which would not pay benefits under any reasonably expected set of circumstances").

## <u>CONCLUSION</u>

For all the foregoing reasons, the court should grant summary judgment in favor of Toppers on the issue of liability under the policy for payment of Toppers' continuing normal operating expenses incurred, including payroll, during the time the governmental closure and stay at home orders prevented it from operating due to the Covid 19 pandemic.

Respectfully submitted,

SPECTOR GADON ROSEN VINCI P.C.

/s/ Daniel J. Dugan
Daniel Dugan, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA, 19103
215.241.8872/ 215.531.9120 (fax)
*ddugan@sgrvlaw.com*

July 24, 2020                                    *Attorneys for Plaintiff,*
                                                 *Toppers Salon & Health Spa, Inc.*